[No. 25182. Department Two. February 26, 1935.]

JAMES WALL-A-HEE, *Respondent,* v. NORTHERN PACIFIC RAILWAY COMPANY, *Appellant.*

MARY MANN, *Respondent,* v. NORTHERN PACIFIC RAILWAY COMPANY, *Appellant.*

NOAH SALUSKIN, *Respondent,* v. NORTHERN PACIFIC RAILWAY COMPANY, *Appellant.*[1]

[1]Reported in 41 P. (2d) 786.

*L. B. daPonte* and *Robert S. Macfarlane,* for appellant.

*E. K. Brown* and *Short & Short,* for respondents.

GERAGHTY, J.—Three separate actions are here consolidated for the purpose of trial and appeal. They were brought to recover the value of thirty-six horses killed or rendered valueless by smothering during transportation over the railway of the defendant, Northern Pacific Railway Company.

The owners of the horses, all full-blooded Indians, were to appear with the horses and equipment in an Indian village presentation at the Western Washington Fair, at Puyallup. One of the plaintiffs, Noah Saluskin (frequently referred to in the record as Chief Saluskin), in April, 1931, entered into a contract with

the Western Washington Fair Association, through its agent, W. A. Linklater, in which Saluskin agreed to assemble and bring to the fair a group of Indians, and the fair association agreed to pay the transportation charges for the Indians, their horses and equipment, from Yakima to Puyallup and return.

Pursuant to this arrangement, Saluskin gathered together a group of fifty Indians, and Linklater arranged for the purchase of fifty first-class passenger tickets, which would entitle the Indians to the free use of two baggage cars for the transportation of their horses and baggage. Two baggage cars, of the type frequently used for transporting horses, were spotted by the railway company at Wapato, near Yakima, and were there loaded by the Indians, thirty-six horses being put into one car, sixteen horses and baggage into the other. The cars were attached to the regular westbound passenger train and carried as far as Ellensburg, where it was discovered that the thirty-six horses in one baggage car were suffocating, due to improper ventilation and overheating of the car. Twenty-seven of the horses died, and the nine surviving were rendered valueless.

The cases were tried to a jury, and verdicts returned in favor of the plaintiffs for the full value of the horses. Motions for new trials were made and overruled. The defendant appeals from the judgments entered upon the verdicts.

While negligence was disputed in the trial, the appellant concedes that this issue has been foreclosed by the verdict of the jury, but contends that the recovery should have been limited to one hundred dollars for each animal, and to a total of not exceeding two hundred dollars for all animals in the baggage car. The appellant introduced in evidence its tariff schedule, designated "Special Car and Train Tariff No. 28-10,"

which had been regularly filed with the department of public works of the state of Washington. This schedule provided for the use of two baggage cars upon the purchase of fifty first-class passenger tickets, and contained (among others) the following provisions:

"Section B. Rule 9: Unless at the time special baggage car contract is executed (as provided by Rule 12) a greater sum is declared by the person executing the same and inserted in the contract, and charges for excess value paid as provided in Rule 10, the value of the property transported in special baggage car shall be deemed and agreed to be not in excess of the following released values:

"Horses or Mules: Released Values
 "Each ............................$100.00
 "In the aggregate................. 200.00

. . . . . . . . . . . . . . . . . . . .

"Section B. Rule 12 (b): Any person availing himself of special baggage car service, shall be deemed to have ratified all the terms of the special baggage contract under which such service is furnished."

The record of the trial shows affirmatively that none of the several owners of the horses had any actual knowledge of the tariff or its regulations, and that none of them assented to, or entered into, any written or oral contract contemplating a released or limited valuation. Linklater, who arranged for the purchase of the tickets, did not sign any contract or receive any bill of lading, statement or receipt stipulating a released valuation; nor is there evidence that he knew the terms of the tariff schedule relating to released valuation. However, the appellant introduced in evidence a contract incorporating the special provisions of tariff schedule No. 28-10 signed by one Alex Saluskin, a nephew of Chief Saluskin, but who did not own or have any interest in the horses involved in the shipment. Alex Saluskin testified that he had not been authorized to sign the contract by any of the owners

of the horses, and had no authority to arrange the shipping terms; that he signed upon the statement: "Well, it doesn't make any particular difference who signs it just so the cars have got to have a release in order to be taken out of here."

For the purpose of establishing Alex Saluskin's agency, the appellant relies principally upon the testimony of Chief Saluskin. On cross-examination, he said:

"Q. Who had charge of the loading of the horses? A. When I left there I gave—I let Alex Saluskin and Charlie Saluskin take charge of my horses, of the loading. Q. You were in charge of the entire party, weren't you? A. Yes. Q. And so when you left, then, you left those two younger men in your place, is that it? A. Yes."

On redirect examination, in explaining the nature of his relation to the enterprise, Chief Saluskin, who could neither speak nor write English, through an interpreter said:

"Linklater asked me if I would take in charge of these Indians, take them over there, and try and look after these Indians, the head of all these Indians, forty persons I think it was, forty Indians, and let them bring all the horses. That is how I got kind of charge of them, to oversee them."

The horses were brought to Wapato by their owners, who were present and assisted in the loading, although Chief Saluskin himself, who owned many of the horses, had left Wapato for Ellensburg before the loading was completed. All of the owners testified that Alex Saluskin did not have authority to enter into any contract for them; that they did not know the contract had been signed or even that one was necessary.

The trial court, in submitting the case to the jury, gave the following instructions:

"I further instruct you that in your determination

of this matter you must first determine whether or not Alec Saluskin was the agent of the particular owner whose claim you have under consideration, in the execution of Defendant's Exhibit 1 herein, being special baggage car contract, and in determining the question of such agency, I instruct you that agency may be created by an affirmative agreement or consent or by such actions or words as imply such agency; but such agency must refer specifically to the power exercised by such agent, or the right to exercise that power must be reasonably inferrable therefrom.

"If you determine that Alec Saluskin was not the agent of any one for the purpose of the execution of the special baggage car contract, then, as to such owner you will reject entirely the affirmative defense alleged by the defendant herein relative to the limitation of liability set forth in said special baggage car contract, and, if upon the other phase of the case you find for such owner, you will fix his damages without consideration of any limitation placed thereon by this special baggage car contract.

"If, upon the other hand, you find that said Alec Saluskin was the agent of any particular owner in the making of said special baggage car contract, then, I instruct you that you must determine what, if any, of said horses were ordinary livestock, ordinary livestock being, for the purpose of this case, all horses except such as are chiefly valuable for breeding, racing, show purposes, or other special uses. I instruct you that as to ordinary livestock the special baggage car contract does not limit the amount of recovery. In other words, as to such of said horses, if any, which you find to be ordinary livestock, the defense set up seeking to limit the recovery to one hundred dollars for each animal, and two hundred dollars in the aggregate for all animals, is not applicable, and for the loss of such ordinary livestock, if any there be, the owner would be entitled to recover his actual damage.

"As to any of said horses which are not ordinary livestock, if any there be, the limitation of one hundred dollars for each animal or two hundred dollars for all animals in the aggregate is applicable, and you could

not find more than that limited value in this case, as to such horses not ordinary livestock." Instruction No. 6.

"Should you find by a preponderance of the evidence that the defendant was negligent in any one of the particulars in issue in this case, and that such negligence was the proximate cause of the death or injury of the horses for whose deaths or injuries damages are sought in this case, and should you further find by a preponderance of the evidence that plaintiff was not guilty of contributory negligence, then your verdict will be for plaintiff and against defendant in such sums as in your judgment were the values of the horses killed or injured, . . . unless you find that the defendant has established by a preponderance of the evidence that the alleged agreement limiting the value of any one animal to one hundred dollars and the animals in the aggregate to two hundred dollars as set forth in defendant's answer was entered into by the defendant and the Indians who at the time of the injuries complained of were the owners of said animals." Instruction No. 14.

It will be observed that the court held it was a question for the jury whether Alex Saluskin was the agent of plaintiffs for the purpose of executing the special baggage car contract; and that, if the jury found he was not the agent of the owners for that purpose, the plaintiffs would recover for their full loss. The jury was also instructed that, even if Alex Saluskin had authority to sign the contract as agent, the plaintiffs could still recover the full value of the horses if they were found to be ordinary livestock. The correctness of these instructions raises the decisive issue in the case.

■■■ Relying upon Rem. Rev. Stat., §§ 10354, 10356 and 10357 [P. C. §§ 5545, 5547 and 5548], which prohibit a common carrier from charging any different compensation for transportation of persons or property than those specified in its schedules on file with the department of public works, and from extending

to any shipper or person any privileges or facilities in the transportation of passengers and property, except such as are regularly and uniformly extended to all persons under its filed schedules, the appellant contends that a shipper taking advantage of a lower tariff rate is bound by its provisions limiting the amount of recovery to the released valuation upon which the lower rate is based, whether or not he has knowledge of the tariff or has given his assent to its provisions. This contention, founded upon statutes general in their nature, overlooks the specific provisions of Rem. Rev. Stat., § 3673-1 [P. C. § 482-1]. This section, omitting immaterial portions, is as follows:

"Any common carrier, railroad or transportation company receiving property for transportation wholly within the state of Washington from one point in the state of Washington to another point in the state of Washington, shall issue a receipt or bill of lading therefor, and shall be liable to the lawful holder thereof for any loss, damage or injury to such property caused by it . . . ; and any such common carrier, railroad or transportation company so receiving property for transportation wholly within the state of Washington, shall be liable to the lawful holder of said receipt or bill of lading, or to any party entitled to recover thereon, whether such receipt or bill of lading has been issued or not, for the full actual loss, damage or injury to such property caused by it . . ., notwithstanding any limitation of liability or limitation of the amount of recovery, or representation or agreement as to value in any such receipt or bill of lading, or in any contract, rule, or regulation, or in any tariff filed with the Department of Public Works; and any such limitation, without respect to the manner or form in which it is sought to be made, is hereby declared to be unlawful and void; provided, however, that the provisions hereof respecting liability for full actual loss, damage or injury, notwithstanding any limitation of liability or recovery or representation or agreement or release as to value, and declaring any such limita-

tion to be unlawful and void, shall not apply, first to baggage carried on passenger trains, automobile stages or boats, or trains or boats carrying passengers; second, to property, except ordinary livestock, received for transportation concerning which the carrier shall have been or shall hereafter be expressly authorized or required by order of the Department of Public Works, to establish and maintain rates dependent upon the value declared in writing by the shipper or agreed upon in writing as the released value of the property, in which case such declaration or agreement shall have no other effect than to limit liability and recovery to an amount not exceeding the value so declared or released; . . . The term 'ordinary livestock' shall include all cattle, swine, sheep, goats, horses and mules except such as are chiefly valuable for breeding, racing, show purposes, or other special uses.''

Under this section, in order that the provisions of a published tariff permitting limitation of liability to a released valuation may become operative, there must be a ''value declared in writing by the shipper or agreed upon in writing as the released value of the property.'' Without this, the carrier remains under the strict prohibition of the statute against any limitation of liability. *American Ry. Express Co. v. Galt,* 128 Miss. 81, 90 So. 597, 25 A. L. R. 728; *Anderson v. Atlantic Coast Line R. Co.,* 163 S. C. 350, 161 S. E. 523; *Hunter v. American Ry. Express Co.,* 4 S. W. (2d) (Mo. App.) 847; *Kristianson v. American Ry. Express Co.,* 122 S. C. 528, 115 S. E. 899, writ of error dismissed, *American Ry. Express Co. v. Kristianson,* 260 U. S. 755, 43 S. Ct. 94, 67 L. Ed. 498; *Bragg v. Taylor,* 205 App. Div. 59, 199 N. Y. Supp. 156, affirmed 236 N. Y. 666, 142 N. E. 327.

The provision of the tariff schedule (Sec. B, Rule 12 [b]) that any person availing himself of special baggage car service shall be deemed to have ratified

the special car contract, does not aid appellant's position. In so far as a published tariff may by its terms attempt to relieve the carrier from the obligations imposed by the statute, it is unenforcible and void. If Alex Saluskin was not the agent of the shippers in the signing of the special baggage car contract, then there is in this case no evidence of any written declaration of released valuation.

It is a well recognized principle that, if one would charge another by the act of a third party, the former must establish the real or apparent authority of the alleged agent. In this case, the evidence does not support any finding of real authority. Chief Saluskin and the other owners, as well as Alex Saluskin, testified that no authority had been given. Whatever authority Alex Saluskin had to bind the owners to the contract of shipment, must be implied from the testimony of Chief Saluskin that, after he proceeded ahead of the party to Ellensburg, he left Charlie Saluskin and Alex Saluskin in his place. Is this sufficient to establish Alex Saluskin's authority to sign the contract, as a matter of law? The rule is stated in 4 Elliott on Railroads (3rd Ed.), p. 716:

"The agent of the owner of goods, who is authorized by him to deliver them to the carrier for transportation, is presumed to have authority to contract with the carrier for that purpose, and the carrier has a right to assume, in the absence of anything to the contrary, that such agent has authority to bind the owner by any contract such as is ordinarily made for transportation of property of the kind offered for carriage. The owner will, therefore, be bound, in such cases by a just and reasonable stipulation limiting the liability of the carrier in the contract made by such agent to the same extent as if it had been made by himself. But circumstances may sometimes rebut the presumption as to the general authority of the agent to bind the owner by a special contract limiting the liability of the carrier."

It was not shown that Alex Saluskin had any specific authority to agree to the terms or conditions of the shipment. The shipment had already been arranged for, and a fair inference from all the testimony is that his connection with the loading was merely casual. His relation to the chief and the fact that he could speak and write English gave him a position of leadership among the other Indians present. But this did not necessarily imply an agency to represent the owners of the horses in signing the contract. There was nothing in his conduct, nor in that of the owners, calculated to mislead the appellant's agent into the belief that he had authority over the shipment. He owned none of the horses, did not bring them to the place of loading, and whatever his responsibilities were, they were shared by the other Indians, including the owners of many of the horses, who were present and not consulted about the contract. These circumstances sufficiently color and interpret the testimony of Chief Saluskin, and tend to rebut any presumption or inference of authority to sign for the owners which might otherwise arise from the testimony standing alone. The circumstances, at least, fairly raised a question of fact for the jury as to his agency.

The authority of Chief Saluskin himself to bind the members of his tribe in transactions involving their private property, is not shown. Doubtless, as hereditary chief, he was their leader and possessed much moral influence, but this did not authorize him to bind the members of his tribe in relation to their individual property. Of course, Chief Saluskin himself owned many of the horses, and could have authorized his nephew to represent him in executing the shipping contract. But it cannot be said, as a matter of

law, that the evidence conclusively established this agency.

 It remains to be determined whether the shipment of horses was a baggage shipment. In Black's Dictionary, baggage is defined as

". . . such articles of personal convenience or necessity as are usually carried by passengers for their personal use, . . . The term includes whatever the passenger takes with him for his personal use or convenience according to the habits or wants of the particular class to which he belongs, either with reference to the immediate necessities or ultimate purpose of the journey."

The essential qualification is that the property be personal to the passenger, and carried for his use and convenience. Thus, the term has been held not to include merchandise, masquerade costumes carried in a trunk for use at a ball, stage properties, paraphernalia, advertising matter and the like (*Oakes v. Northern Pacific Ry. Co.,* 20 Ore. 392, 26 Pac. 230, 12 L. R. A. 318, 23 Am. St. 126; *Saunders v. Southern Ry. Co.,* 62 C. C. A. 523, 128 Fed. 15; *Michigan etc. Ry. Co. v. Oehm,* 56 Ill. 293), such articles being intended for a larger purpose than personal use.

Horses can hardly be said to come within any of the recognized definitions of baggage. The use of the term "baggage" in the statute (Rem. Rev. Stat., § 3673-1) must be confined to such articles of personal convenience or necessity usually carried by passengers for their personal use, as defined above, rather than in the broader sense implying any property accepted by the carrier as baggage. To permit the carrier to classify a shipment of freight or livestock as baggage, or to agree with the shipper to carry such property as baggage, would enable the carrier to avoid the positive prohibition of the statute against limitation of liability.

If any of the animals involved in this shipment were ordinary "livestock" within the statutory definition, absolute liability for actual loss or damage must be assumed by the carrier, and no provision in the tariff or agreement with the shipper can change or modify this obligation. The character of conveyance in which the animals are to be carried, or the rate charged for carriage, is not made by the statute the basis for fixing the right of the carrier to limit liability. The provision against limitation of liability to any amount less than actual value in the case of ordinary livestock is absolute. There was sufficient evidence in this case that most of the animals were ordinary livestock, in the sense that they were not chiefly valuable for breeding, racing, show purposes, or other special uses, to justify the instruction given by the court.

The trial court committed no error in giving the instructions challenged by the appellant. The judgment will be affirmed.

BEALS, TOLMAN, HOLCOMB, and BLAKE, JJ, concur.