No. 37,030

M. D. CLUBB, *Appellee*, v. PARK HETZEL, JR., doing business as LAWRENCE TRANSFER & STORAGE COMPANY, *Appellant.*

(198 P. 2d 142)

Opinion filed October 9, 1948.

*George K. Melvin,* of Lawrence, argued the cause, and *A. B. Mitchell,* of Lawrence, was with him on the briefs for the appellant.

*Henry H. Asher,* of Lawrence, argued the cause, and *Clarence M. Gorrill, Alan F. Asher,* both of Lawrence, and *A. R. Swank,* of Stillwater, Okla., were with him on the briefs for the appellee.

The opinion of the court was delivered by

HOCH, J.: This was an action by a shipper to recover for the loss of household goods and other property destroyed by fire while being

transported in interstate movement by a common carrier by motor vehicle. A jury was waived and the case tried to the court. The controlling question in the trial court and upon this appeal is whether under the facts and circumstances shown, the carrier was liable under the common law or under a contractual limited liability provided for by federal law and the rules of the interstate commerce commission.

At the opening of the trial in the lower court it was stipulated between the parties that if the common-law rule applied, the amount recoverable should be $6,600, and that if a limited liability was effectively agreed upon between the parties, the amount of the recovery should be $2,200. The trial court found the defendant liable under the common law and gave judgment for the plaintiff in the sum of $6,600, less a credit of $133.50 for freight charges on another shipment transported for the plaintiff by the defendant. From that judgment, defendant appeals.

The evidence consisted of oral testimony of the plaintiff and of the defendant and his wife, and various exhibits in writing. Insofar as the finding of the trial court relates to questions of fact, we are concerned only with whether there was substantial evidence to support such findings.

Appellee testified that on July 5, 1946, he went to the office of the appellant, Hetzel, in Lawrence and talked to him about moving his property from Stillwater, Okla., to Lawrence. Hetzel told him he could furnish the service and showed him a large cab trailer transport truck with the sign "Lawrence Transfer Company," and over at the side on the corner "Aero-Mayflower Company" and the statement "Exclusive Agency." He told Hetzel that he much preferred the Aero-Mayflower service, and Hetzel said that he would furnish it if he could. That day or the next day Hetzel gave him blanks, in triplicate, two of which he was to return and one of which he was to keep. He took them with him to Oklahoma, signed two of them and returned them. On July 7, 1946, he wrote a letter from Stillwater, Okla., addressed to Park Hetzel, Jr., "Proprietor, Lawrence Transfer and Storage Company at Lawrence" to which reference will later be made. The truck arrived at Stillwater on July 30. The truck was not the Aero-Mayflower truck which Hetzel had showed him. It had no such sign painted on either side. He was there and saw the trucks that were loaded. The property was loaded by the men who accompanied the truck. He first saw a bill of lading about

three days later which was after the first truckload had burned. There was a public weighing scale less than a mile and a half from where the truck was loaded. He learned from Hetzel in a telephone conversation on the evening it was loaded that the truck had caught fire and that the contents were a total loss. A second truck arrived two days later and took the rest of his goods to Lawrence. He arrived at Lawrence before the second truckload arrived and was told that the-goods were there and was given a bill of lading to sign, but he refused to sign it.

Appellee further testified that he did not know either Hetzel or his wife prior to going to their office, but had heard of the Aero-Mayflower Company and had heard that Mr. Hetzel was agent for that company before he went to his office. He had talked with both Hetzel and his wife on both occasions. One of them explained the proposition of rates but he didn't remember seeing a copy of the tariff until after the fire; that Schedule A was referred to in the Aero-Mayflower order for service and as far as he remembered he learned of Schedule A from it. He did not remember that Mrs. Hetzel explained the proposition of the thirty-cent released value. He was given blanks to work over and return. Mrs. Hetzel spoke something about figuring weight, but he didn't remember that she figured the thirty-cent value or told him how much he would receive if the shipment should be destroyed. His remembrance was that he figured out "Exhibit 5" (not here shown) to see whether one truck would carry all the goods. He wanted to know how much it was going to cost and which one of the rates the goods were to be shipped under. He didn't remember the term "released value" but supposed it was used. He didn't remember that Mrs. Hetzel figured the amount they would be liable in case of loss. He saw the document, the Aero-Mayflower bill or order for service, but was not very clear on the application of thirty cents per pound released value, with application of Table A. Hetzel told him he was a representative of Aero-Mayflower and they discussed how the shipment would be handled. Hetzel told him he would use the Aero-Mayflower truck if their schedule fitted his schedule and if it did not, he would send his own truck down. He ordered the service on July 7 as of July 30.

The appellant Hetzel testified that he was the owner and manager of Lawrence Transfer and Storage Company; that he talked to the appellee twice before moving the goods; that his wife had been talking with appellee, checking as to the size of the load and had

turned the matter over to him. Appellee wanted to know what it would cost him and he gave him rates and told him their estimate was on the basis of the weights and it would cost him so much if he used Class I, Table A. They went into the matter of insurance because he told the appellee that the rate quoted was limited to a released value not to exceed thirty cents per pound for each article, and that if he had a higher value that would cost him more than the quoted rate. Appellee wanted the shipment made as near to the date suggested as possible and wanted the Mayflower to take the shipment if it could and, if not, for him to take it. When the appellee looked at the truck of the Aero-Mayflower Company he was told that he didn't know that they could use that truck as it might be out of town. Appellee replied he didn't care which way, but he wanted to be sure that the truck was there at a definite time. He went into the matter of rates very carefully.

It is unnecessary to recite further testimony on the part of appellant, since it deals largely with matters on which there was more or less of a conflict, or as to matters not material to the present issue.

The "order for service" forms which, as heretofore noted, were furnished in triplicate to the appellee, were supplied by the Aero-Mayflower Transit Company, and the name of that company was shown in large type at the top of the form. The two copies of these forms returned to appellant by appellee were signed by appellee and had been filled in by him to the extent of writing in the name and address from which the property was to be obtained and to which it was to be delivered. The forms did not, however, carry any information as to the estimated cost of the transportation services or any specific information as to the estimated weight of the shipment, nor were they filled out in the place provided for declaring the released value. The forms did contain the following printed statement:

"Shippers Are Required to Declare in Writing the Released Value of the Property—

"(1) When released value does not exceed 30¢ per pound, per article, Transportation Rates shown in Table A of Tariff will apply.

"(2) When released value exceeds 30¢ per pound, per article, but does not exceed 75¢ per pound, per article, Transportation Rates shown in Table B of Tariff will apply.

"(3) When released value exceeds 75¢ per pound, per article, but does not exceed $1.50 per pound, per article, Transportation Rates shown in Table C of Tariff will apply."

The above order forms were enclosed by the appellee in the following letter:

"July 7, 1946

"Park Hetzel, Jr., Proprietor
"Lawrence Transfer and Storage Co.
"733 New Hampshire Street
"Lawrence Kansas
"Dear Mr. Hetzel:

"On looking up the date, I find that summer commencement here is July 27; but since we cannot get possession in Lawrence before the first, we cannot take advantage of the three or four July days except for packing. What I should like to do is to have our truck-load of goods arrive at 624 Kentucky Street on the morning of August 1. Please let me know as soon as you can about what hour, on what day, your truck will reach the above address for loading, as closely as you can calculate it, so that we may have the stuff all ready.

"We shall drive up with a little trailer load of our own so as to be at the Lawrence address when the van arrives, to get the stuff in the right rooms.

"I enclose the signed order (two copies). You forgot to tell me whether I should sign the order for Insurance. If the insuring is not a separate transaction, when the normal 30c value per pound is what I intend you to insure for, since Table A of the Tariff automatically applies, please cross out my second signatures. I signed the Insurance Order to save time, in case these signatures are needed even in the standard transaction. The amount to be filled in, if it is a separate matter, should be the full 30c value for the entire poundage; for if there were a total loss, this rate would not cover full replacement of the 'sound value'.

"Yours sincerely,

"M. D. Clubb"

When the second load was received, appellant submitted a bill of lading covering both truckloads. This bill of lading which appellee refused to sign, was offered in evidence.

Appellant offered in evidence copy of the rules and regulations issued by the interstate commerce commission covering the tariff under which he claimed the appellee had agreed that the goods should be shipped. These regulations are lengthy and it will suffice for the present purposes to quote the following pertinent provisions:

"RULE 1

"Property Subject to Uniform Household Goods Bill of Lading.

"(a) Unless otherwise provided, when property is transported subject to the provisions of this tariff, or as amended, the acceptance and the use of the Uniform Household Goods Bill of Lading as described herein is required.

"(b) The rates shown herein are reduced rates conditioned upon the use of the Uniform Household Goods Bill of Lading. Consignor, at his option, may elect not to accept the terms of the Uniform Household Goods Bill of Lading,

and in lieu thereof to have the carrier transport the property with carrier's liability limited only as provided by common law and by the laws of the United States and the several States insofar as they apply, but subject to the terms and the conditions of the Uniform Household Goods Bill of Lading insofar as such terms and conditions are not inconsistent with such common carrier's liability; the rate charged therefor will be 100 percent higher than the transportation rate contained in this tariff as would apply for such shipment if offered for transportation at a released value not exceeding 30 cents per pound, per article.

. . . . . . . . . . . . . . .

### "RULE 2

"INSURANCE.

"The cost of insurance against marine risk or any insurance in the name of the shipper, or for the benefit of the shipper, will not be assumed by the carrier.

### "RULE 3

"DECLARATION OF VALUE.

"(a) *Shippers are required to state specifically,* in writing, the agreed or *declared value of the property.*

"(b) Valuations shall be declared in accordance with interstate commerce commission released rates order MC-No. 2, of January 29, 1936, and stated in cents or dollars and cents per pound per article.

"(c) *If shipper declines to declare the value or agree to a released value in writing, the shipment can not be accepted.*

"(d) The agreed or declared value shall be deemed to relate to all services undertaken by the carrier or its agents and to each article separately and not to the shipment as a whole, and *such agreed and declared value must be entered on Bill of Lading* in the following form:

"THE AGREED OR DECLARED VALUE OF THE PROPERTY IS HEREBY SPECIFICALLY STATED BY THE SHIPPER TO BE NOT EXCEEDING $———— per pound per article."

. . . . . . . . . . . . . . .

### "RULE 4

"BASIS OF WEIGHT.

"(a) The tare weight of each vehicle used in the transportation of household goods shall be determined by having it *weighed prior to the transportation* of each shipment, without the crew thereon, by a certified weighmaster or on a certified scale, and when so weighed the gasoline tank on each such vehicle shall be full and the vehicle shall contain all blankets, pads, chains, dollies, hand trucks, and other equipment needed in the transportation of such shipment. Each carrier shall retain in the vehicle, subject to inspection, a weighmaster's certificate or weight ticket as to each such vehicle showing the tare weight, the date weighed, and a list of such equipment.

"(b) After the vehicle has been loaded it shall be weighed, without a crew thereon, prior to delivery of the shipment and the net weight shall be determined by deducting the tare weight from the loaded weight, except that *in instances where no adequate scale is located at origin or at any point within*

*a radius of 10 miles thereof, a constructive weight,* based on seven pounds per cubic foot of properly loaded van space, *may be used.* The gross weight, tare weight, and net weight, or the constructive weight, *shall be shown on the Bill of Lading and Freight Bill.*

"(c) In the transportation of part loads this rule shall apply in all respects, except that the gross weight of a vehicle containing one or more part loads may be used as the tare weight of such vehicle as to part loads subsequently loaded thereon, and a part load for any one shipper, not exceeding 1,000 pounds, may be weighed on a certified scale prior to being loaded on a vehicle, such part load to be accompanied by a weight ticket evidencing such weighing." (Italics supplied.)

There is no controversy here as to the transportation rates applicable under the tariff where released value not exceeding thirty cents per pound per article has been made in conformity with the regulations.

Appellee's contention is predicated primarily upon the proposition that a common carrier has a common-law liability for the full value of the goods destroyed, unless he complies fully and strictly with the provisions of the interstate commerce act, and the regulations of the commission relating to limitation of liability, and that the burden is upon the carrier to show such compliance.

Appellant contends that the evidence established a substantial and sufficient compliance with the requirements for limiting a carrier's liability.

There is no need here to recite in detail the provisions of the applicable federal statutes or their legislative history. The pertinent statutory provisions are found in section 20(11) of the interstate commerce act (49 U. S. C. A. § 20[11]). These provisions, theretofore applicable to common carriers by rail, were later made applicable to common carriers by motor vehicle (49 U. S. C. A. § 319). The statute provides, in part, as follows:

"Any common carrier, . . . subject to the provisions of this chapter receiving property for transportation from a point in one state . . . to a point in another state, . . . shall issue a receipt or bill of lading therefor, and shall be liable to the lawful holder thereof for any loss, damage, or injury to such property, caused by it . . . and no contract, receipt, rule, regulation, or other limitation of any character whatsoever, shall exempt such common carrier . . . from the liability hereby imposed; and any such common carrier . . . shall be liable to the lawful holder of said receipt, or bill of lading or to any party entitled to recover thereon, whether such receipt or bill of lading has been issued or not, for the full actual loss, damage, or injury to such property caused by it . . . notwithstanding any limitation of liability or limitation of the amount of recovery or representation or agreement as to value in any such receipt or bill of lading, or in any contract, rule,

regulation, or in any tariff filed with the Interstate Commerce Commission; *and any such limitation, without respect to the manner or form in which it is sought to be made is declared to be unlawful and void;* . . . *Provided, however,* That the *provisions hereof respecting liability* for full actual loss, damage, or injury, notwithstanding any limitation of liability or recovery or representation or agreement or release as to value, and declaring any such limitation to be unlawful and void, *shall not apply* . . . to *property* . . . received for transportation *concerning which the carrier shall have been or shall be expressly authorized* or required by order of the Interstate Commerce Commission *to establish and maintain rates dependent upon the value declared in writing by the shipper or agreed upon in writing as the released value of the property* . . . and any tariff schedule which may be filed with the commission pursuant to such order shall contain specific reference thereto and *may establish rates varying with the value so declared or agreed upon.*" (Italics supplied.)

Appellee contends that the appellant failed in the three following specific particulars to comply with the rules and regulations promulgated by the interstate commerce commission, compliance with which is necessary in order for the carrier to limit its liability for loss:

First, he did not weigh the shipment as required; second, he did not procure a released or declared value of the shipment from the shipper in the manner provided; third, contrary to the regulations he accepted the goods for shipment without a bill of lading.

It is said (with supporting citations from many jurisdictions) in 10 C. J. 110:

"In the absence of proof to the contrary, the liability of a carrier is always presumed to be its common-law liability, and any party attempting to show a greater or a less liability must assume the burden of proving the contract by which the common-law liability was affected."

This general rule is particularly applicable to one who seeks to establish some right under an exemption provision of a statute (35 C. J. S. 185, and cases cited in note 87).

In *Hunter v. American Ry. Express Co.* (Mo. App.) 4 S. W. 2d 847, which dealt *inter alia* with the right of a carrier to limit its liability, it was said:

"As general rule, where law gives party right on his complying with certain named conditions, he must comply therewith before right will inure to his benefit." (Syl. ¶ 3.)

"Party seeking to avail himself of any exception to general rule carries burden of establishing facts necessary to invoke provisions of exception." (Syl. ¶ 6.)

In *Wall-A-Hee v. Northern Pacific R. Co.,* 180 Wash. 656, 41 P.

2d 786, it was said, with numerous cases cited in support of the statement:

"Under this section, in order that the provisions of a published tariff permitting limitation of liability to a released valuation may become operative, there must be a 'value declared in writing by the shipper or agreed upon in writing as the released value of the property.' Without this, the carrier remains under the strict prohibition of the statute against any limitation of liability." (p. 664.)

The interstate commerce commission Rule 4, *supra*, provides that the tare weight of the vehicle is to be determined "prior to the transportation" and that a *contructive* or computed weight of the loaded vehicle, based on seven pounds per cubic foot, may be used in cases "where no adequate scale is located at origin or at any point within a radius of ten miles thereof." There was uncontradicted testimony that there was a licensed public scale within a mile and a half of the place where the shipment was loaded. However rigid this regulation may seem to be, it was up to the carrier to comply with it.

The interstate commerce act provides that the initial carrier receiving property for transportation in interstate commerce shall issue a bill of lading therefor. (9 Am. Jur. 663, note 7; 1 Roberts Federal Liabilities of Carriers, 2d ed., pp. 736, 737.)

In *Behrends v. Chicago, Rock Island & Pacific Ry. Co.*, 198 Ill. App. 236, it was said:

"A bill of lading limiting the liability of the carrier for damages for delay in shipment of livestock in order to be binding, must be delivered to the shipper at the time the stock is accepted for carriage, unless there is an agreement that it shall be delivered at a future time." (Syl. ¶ 1.)

Again, the carrier did not show compliance with interstate commerce commission Rule 3, *supra*, as to declaration of value. It will be noted that shippers are required to state specifically, in writing, a declared value of the property, and that this declared value must be entered on the bill of lading in the form prescribed, and that if the shipper declines to declare a released value in writing "the shipment cannot be accepted." The order form, returned by the appellee, contained no declaration of value in the place provided in the form for that purpose. No declared value was entered on a bill of lading, no bill of lading having been issued before shipment, and the shipper declined to sign the one made out by the carrier after the goods had been destroyed. (See *Mickey Finn Clothes v. Yale Transport Corp.*, 23 N. Y. S. 2d 84, syl. ¶ 3, 175 Misc. 242; also,

*American Railway Express Co. v. Estroff,* 31 Ga. App. 577, 121 S. E. 711.)

The appellant, having failed to comply with the regulations, could not assert a limited liability for loss. This conclusion makes it unnecessary to consider the question whether appellee's letter, shown above, was sufficiently clear and definite as to constitute an effective election of the lesser rate. While the trial court did not specify the grounds upon which the appellant was held to a common-law liability, it may have construed the letter as a selection of a lesser rate only upon the condition that Hetzel would secure additional insurance. If that was the intention of the shipper, it could not be said that he unequivocally chose the lesser rate.

It follows from what has been said that we find no grounds for disturbing the judgment of the trial court.

The judgment is affirmed.

HOCH, J. (dissenting): I am unable to concur in the opinion in this case, which fell to my lot to write for the court.

The fundamental question is whether the shipper, having knowingly chosen, in writing, the cheaper transportation rate, based on a limited recovery in case of loss, may, after the loss has occurred, repudiate his written agreement and recover the full value to which the higher rate would have entitled him. That result should not be reached except for the most compelling reasons.

I find no ambiguity in appellee's letter of July 7, 1946, quoted in the opinion. It seems perfectly clear to me that he knowingly chose the lower rate. He specifically stated in the letter that "Table A of the tariff automatically applied." He understood that the selected rate meant a limited recovery in case of loss. Even if he had not actually known the effect of choosing the lower rate under Table A, he would be presumed, by law, to have known it. (13 C. J. S. 701; *Gulf, Colorado & Santa Fe Ry. Co. v. McCandless,* 190 S. W. 2d 185, syl. ¶ 1.) It may well be argued that appellee's letter indicated that he desired additional insurance, and if so, he may have just complaint that Hetzel did not see to it that such additional insurance was provided. But that is a different matter. It has nothing to do with the recovery available under the transportation rate selected. The published tariff controls and any departure from it would be unlawful, and subject the carrier to penalty.

If there were any doubt as to what the appellee intended in his

letter, it was entirely removed, I think, by his oral testimony. In referring to his letter of July 7, he stated:

"When I said, 'the amount to be filled in if it is a separate matter *should be the full thirty cent value for the entire poundage,*' I meant insurance value. . . . (Italics supplied.)

"There was a discussion there that the thirty cents per pound was the full amount of protection that I would have, unless I wanted additional insurance in which event I could pay for it. With no protection at all, the thirty cents per pound applied and if I wanted additional protection, I had to take out insurance. . . . *When I wrote I was thinking primarily of haulage rate. They explained to me that there were any number of rates I could have, but the cheapest one was the thirty cent rate.*"

The appellee was asked and answered questions as follows:

"Q. They told you it was a thirty cent rate because of the fact *if anything happened they wouldn't be liable for any more than thirty cents per pound value?* A. *In addition* to that *I was thinking of insurance.*

"Q. You told them in your letter in that standard transaction if the insurance wasn't necessary on the thirty cent value to cross your name off. A. Yes, sir." (Italics supplied.)

Appellee thus made it clear that he understood that if he wanted any protection above the thirty cents per pound value, he would have to purchase additional insurance or pay a higher transportation rate. Unless such construction is given to his letter, reference therein to Table A of the tariff and of the thirty-cent value per pound are wholly meaningless. His direction "in writing" to ship at the lower rate, provided for in Table A of the tariff, was necessarily a declaration that the released value would not exceed thirty cents per pound per article, since that was the condition upon which such rate was made available by the tariff.

It is pertinent to note at this point that appellee's goods were loaded on two of appellant's trucks, the second of which, loaded later, arrived safely. The transportation charge on the second load, based upon the lower, the thirty cent released value rate, amounted to $133.50. Appellee agreed to sign the bill of lading, so based, as to the second load when it arrived, but not as to the first load. It was stipulated at the trial that the $133.50 should constitute an offset to whatever judgment might be rendered for plaintiff. If the higher rate had been used, under which full recovery would be available, the charge would have been more, thus reducing appellee's judgment by that amount. In other words, appellee has recovery, under the higher transportation rate, for the destroyed load, but pays only the lower rate on the load which arrived safely.

The stipulation was consistent with appellant's contention and inconsistent with appellee's.

It is true that the "orders for services" signed by the appellee were on blanks of the Aero-Mayflower Transit Company. But appellee did not testify that the property was to be transported only in an Aero-Mayflower truck. He only said that he preferred to have it so handled. He testified:

"We talked about the Aero-Mayflower Company, and I said I very much preferred to have the Aero-Mayflower service, and Hetzel said something to the effect that he would furnish it if he could."

On cross-examination he testified:

"In talking with Mr. Hetzel, he told me he was a representative of the Aero-Mayflower people and we discussed how the shipment would be handled. He told me he would use the Aero-Mayflower truck on the job if the Aero-Mayflower schedule fitted my schedule, and if it did not, he would send his own truck down, and I ordered the service on July 7th as of July 30th."

Moreover, his letter was addressed to the appellant as "Proprietor, Lawrence Transfer and Storage Company," and in the body of the letter he referred to "your truck." The same thing again appears in another letter, likewise addressed; which he wrote eleven days later. Furthermore, it may be observed the appellee was present when appellant's truck was loaded, and permitted his property to be loaded upon it without objection.

The court's opinion is based upon the proposition that the carrier did not strictly comply with the regulations relating to limitation of liability for loss. It is said, first, that the carrier failed to weigh the shipment as required by the regulations. The regulations provide that the vehicle shall be weighed *"prior to delivery* of the shipment." (Italics supplied.) Certainly if the shipment had not been destroyed the carrier would have been within the regulations by securing the actual weight prior to delivery. Being unable to get actual weight, he must now figure constructive weight, and appellee contends that he can compute a constructive weight only in cases where "no adequate scale is located at origin or at any point within a radius of ten miles thereof."

A rigid construction of the regulation appears to support that view, but I cannot believe that that was the intention. The more reasonable construction is that the provision applies to cases where the weight is determined at point of origin. Applied to such cases, reason for the rule appears. To apply the rigid construction to all

cases would require a motor carrier to make a search over an area extending ten miles in every direction from the point of origin to find out whether there was an "adequate scale" anywhere therein. That would place an unreasonable and impractical burden upon the carrier with resultant delays in shipments. And it must not be forgotten that the carrier has a right to weigh any time "before delivery." In any event, assuming that appellee's construction is correct, it by no means follows that the failure to weigh at origin destroys the contract. Appellee has cited no case holding that failure to get a shipment weighed at the point of origin when there was a scale somewhere within a ten-mile radius makes the contract for limited liability unenforceable. My rather extended research has disclosed no such case.

Again, I cannot agree that failure to enter a declared value on a *bill of lading* defeats the right of the carrier under the contract for the lower rate. There is nothing in Rule 3 which directs when the declared value shall be entered on the bill of lading. Subsection (*a*) of Rule 3 reads: "Shippers are required to state specifically *in writing* the agreed or declared value of the property." (Italics supplied.) The shipper in this case did so state. Counsel cite no case, and I have not been able to find any which holds that value cannot be declared in writing in any manner except on a bill of lading. Nor do I find any provision in the regulations that there can be no limitation upon liability unless a bill of lading is issued to the shipper before acceptance of the shipment. No case has been cited to that effect and I have found none. The case coming nearest to it of any my research disclosed is the Illinois case, *Behrends v. Chicago, Rock Island & Pacific Ry. Co.*, cited in the opinion. Upon analysis, that case does not support the view that a bill of lading delivered to the shipper before acceptance of the shipment is necessary to limitation of recovery. That case involved alleged damage by unreasonable delay in moving a shipment of cattle. The only contract shown before shipment was an oral one. The carrier attempted to limit its liability by the terms of a bill of lading delivered to the shipper two weeks after the shipment and signed by the shipper as a result of alleged misrepresentation as to its terms and effect. The court simply held that a bill of lading limiting liability in order to be binding had to be delivered to the shipper at the time the shipment was accepted unless later delivery had been agreed upon. That would be true as to *any* agreement in writing. In the

Behrends case, *supra,* there was *no* written agreement other than the bill of lading delivered two weeks after the shipment. In the case here the written agreement was *before* the shipment and the shipment was made under it. Moreover, the statute specifically provides that the carrier "shall be liable to the lawful holder of said receipt or bill of lading or to any party entitled to recover thereon whether such receipt or bill of lading has been issued or not," etc. The measure of liability is fixed by the contract regardless of whether a bill of lading or receipt had been issued prior to the loss. Limitation of liability is contingent under the law upon compliance with the regulations as to filing and publishing the tariff and upon "the value declared in writing by the shipper or agreed upon in writing as to the released value of the property." It is said in 1 Roberts' Federal Liabilities of Carriers, 2d ed., p. 737, with supporting cases cited:

"If a carrier receives goods for shipment in interstate commerce and fails to issue the bill of lading prescribed by the federal law, it is nevertheless liable for the value of the goods and damages thereto, to *the same extent as if it had issued the bill of lading."* (Italics supplied.)

In the absence of any provision either in the law or the regulations, clearly making delivery of a bill of lading before acceptance of the shipment a condition precedent to enforcement of the contract, I do not think we should strike down this contract on that ground. At this point I simply note the testimony of appellant that he prepared the bill of lading, subsequently submitted to appellee, prior to sending the first truck to get the goods and that the truck driver took it with him but did not deliver it when he found that all the goods could not be loaded on one truck, and that the bill of lading could not be fully filled out until the remainder of the goods was loaded. Whether appellant is correct in his contention that this procedure was necessary under the regulations in order to make the quoted rate available to the shipper, need not be discussed. What is here said, of course, in no way implies that carriers are not required to issue bills of lading or receipts.

Appellee cited only one case in support of the judgment. That was *Caten v. Salt City Movers & Storage Co.,* 149 F. 2d 428. In that case the shipper was not shown to have declared a value in writing in any document of any sort and for that reason alone the court reached the conclusion that recovery could be had upon the basis of the common-law liability. The absence of any declaration

in writing by the shipper as to value is emphasized repeatedly throughout the opinion. We quote from the opinion:

"All that took place respecting valuation occurred in the two telephone conversations. . . . Everything they did in connection with that matter was done orally." (p. 432.)

The contrary is true in the present case. Moreover, the opinion in that case contains the following comment pertinent here:

"Although action in writing by the shipper is plainly required, his signature is not necessary but it does furnish good evidence that he did declare or agree in writing. Receipt of the writing by the shipper and his action upon it are adequate proof that he has assented to its terms and has made it the written agreement of the shipper and carrier. *American Railway Express Co. v. Lindenburg,* 260 U. S. 584, 43 S. Ct. 206, 67 L. Ed. 414. Compare *Girard Insurance & Trust Co. v. Cooper,* 162 U. S. 529, 16 S. Ct. 879, 40 L. Ed. 1062." (p. 432.)

Many cases might be cited in which recovery was allowed upon a common-law basis where there was *no declaration* of value *in a bill of lading* or *in any other written document.* Such cases are not here applicable.

A recent case involving many of the general principles of law applicable to the present case is *White v. Southern Ry. Co.,* 208 S. C. 319, 38 S. E. 2d 111. The case is also reported in 165 A. L. R. 988. Thereafter follows at page 1005 an extensive and excellent annotation, from which I quote:

"The cases agree that where a shipper, having the opportunity to select a rate of carriage, makes a declaration as to the nature of the shipment or as to its value, with a view to obtaining a reduced rate, a limitation of liability applicable to the reduced rate is effective." (See cases cited in support of the statement at page 1013 of the annotation.)

I find no case squarely in point on the question whether failure to comply strictly with the regulatory provisions here involved vitiates a limited liability agreement, otherwise enforceable. None has been cited by either party. Many cases, however, tend to support the view that the only requirement essential to validity of the contract is a valid tariff covering rates dependent upon declared value and the shipper's selection in writing of the lower rate with its resulting limitation upon recovery in case of loss.

In *Amer. Ry. Exp. Co. v. Lindenburg,* 260 U. S. 584, 43 S. Ct. 206, 67 L. Ed. 414, it was contended that the shipper was not bound to limited recovery because he did not sign the receipt showing the declared value. The Supreme Court of the United States rejected that contention and stated:

"The pertinent words of the statute are: '. . . rates dependent upon the value declared in writing by the shipper or agreed upon in writing as the released value. . . .' It is not to be supposed that the Commission would attempt to add anything to the substantive requirements of the statute, and its order does not purport to do so; but the form of receipt which the express companies were authorized to adopt contains a recital to the effect that as evidence of the shipper's agreement to the printed conditions he 'accepts and signs this receipt,' and a blank space is provided for his signature. Naturally, such signature would be desirable as constituting the most satisfactory evidence of the shipper's agreement, but it is not made a prerequisite without which no agreement will result. . . ." (pp. 590, 591.)

To the same effect, see *Windsor v. Amer. Express Co.*, 34 Del. 16, 143 A. 37, which also held that acceptance by the shipper of the receipt constituted an assent to its terms. To the same effect is *Sands v. American Railway Express Co.*, 154 Minn. 308, 193 N. W. 721. See, also, *Wells Fargo & Co. Express v. Bollin* (Tex. Civ. App.), 212 S. W. 283; *Gulf, Colorado & Santa Fe Ry. Co. v. McCandless* (Tex. Civ. App.), 190 S. W. 2d 185; *Bachos v. Chicago, R. I. & P. Ry. Co.* (Mo. App.), 61 S. W. 2d 416, at p. 418 [1].

Lastly, there is here another controlling factor. Even though the carrier failed to comply strictly with the regulations, in my opinion the shipper in the instant case is barred from recovering the higher value, under the doctrine of estoppel generally applied in these cases. Citing many decisions of federal courts, including the United States Supreme Court, it is said in 1 Roberts' Federal Liabilities of Carriers, 2d ed., p. 722:

"It is the settled federal law that if a common carrier gives to a shipper the choice of two rates, the lower of them conditioned upon his agreeing to a stipulated valuation of his property in case of loss, even by the carrier's negligence, and the shipper makes such choice understandingly and freely, and names his valuation, he cannot thereafter recover more than the value which he thus places upon his property. Having accepted the benefit of the lower rate dependent upon the specified valuation, the shipper is estopped from asserting a higher value."

See, also, *Amer. Ry. Exp. Co. v. Lindenburg,* supra, by the United States Supreme Court, syllabus 5 of which reads:

"And where the terms of the receipt and the carrier's lawful filed schedule show that the charge made was based upon a specified valuation of the goods, by which the carrier's liability was to be limited, the shipper is presumed to have known this, and is estopped from asserting a higher value when goods are damaged in transit."

To like effect, see syllabus 2, *American Brake Shoe & Foundry Co. v. Pere Marquette R. Co.*, 223 Fed. 1018.

In *Noone v. Southern Express Co.*, 79 Fla. 25, 83 So. 607, it was said:

"Common honesty, good faith and fair dealing, . . . would limit the plaintiff in his recovery to the value as declared by him, though made at a time when it was to his advantage to make it small, and now greatly to his disadvantage when suing for the recovery of damages for the loss of his property by one having exclusive control of it . . ." (p. 27.)

If under the same facts and circumstances here shown the shipment had gone through without loss and the carrier had then sought to charge the higher transportation rate, upon the theory that the shipment had been made under a common-law liability, it is hard to imagine that the shipper would not have invoked—and properly so—his letter with its selection of the lower rate. However much the appellee's loss is to be regretted "it is a poor rule that doesn't work both ways."

WEDELL, J., joins in the foregoing dissenting opinion.

PARKER, J., dissents.